**In Re: Anonymous Nos. 78 D.B. 82 and 79 D.B. 82**

Disciplinary Board Docket Nos. 78 D.B. 82 and 79 D.B. 82.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

McDONALD, *Member,* January 18, 1985—pursuant to Pennsylvania Rule of Disciplinary Enforcement 208(d)(2)(iii), the Disciplinary Board of the Supreme Court of Pennsylvania (board) submits its findings and recommendations to your honorable court with respect to the above-captioned petitions of discipline.

## I. HISTORY OF PROCEEDINGS

On December 3, 1982, the Office of Disciplinary Counsel (hereinafter referred to as petitioner) filed separate petitions for discipline alleging professional misconduct against respondents, [    ] and [    ] (hereinafter referred to collectively as Respondents). The petitions are essentially identical and allege that respondents violated D.R. 2-101(A) (dealing with a lawyer engaging in, utilizing or allowing any form of advertising that is knowingly false, fraudulent or misleading), as that rule was amended by order of the Supreme Court of Pennsylvania on July 27, 1979. The petitions described certain advertising techniques and exhibited samples of advertisements said to typify the alleged violations of the rule by respondents.

The gravamen of the charged violations is that respondents regularly placed in newspapers and other publications multiple ads for their legal services. The various ads referred to the same legal services for either no-fault divorces or bankruptcy cases but at different overall prices and/or at different combinations of prices for legal services and court costs.

These matters were referred to hearing committee [      ] consisting of [      ]. Hearings were held by the committee on January 28, 1983, and March 18, 1983. The committee subsequently determined on July 15, 1983, after considering arguments and briefs submitted by respondents and petitioner, that respondents had in fact violated D.R. 2-101(A) (dealing with a lawyer engaging in, utilizing or allowing any form of advertising that is knowingly false, fraudulent or misleading), as charged in each allegation of the petition. A third day of testimony was held on September 16, 1983, to receive evidence on the nature of the discipline to be imposed on respondents.

The report of the hearing committee was filed on June 27, 1984. The hearing committee determined that respondents' advertising practices resulted in several specific instances of both false and misleading advertisements, and misleading advertisements in other specific instances. The committee recommended that respondents receive private reprimands before the Disciplinary Board and six months probation.

Both parties filed exceptions to the report and recommendations of the hearing committee. Petitioner excepted to the recommended discipline and requested that a substantial suspension be imposed with respect to each respondent. The exceptions of respondents contended that no violation of D.R. 2-101(A) (dealing with a lawyer engaging in, utilizing

or allowing any form of advertising that is knowingly false, fraudulent or misleading), had been established and, if established, no sanction greater than informal admonition should be imposed.

These matters came before the Disciplinary Board for adjudication on September 11, 1984.

## II. STATEMENT OF FACTS

Respondent, [respondent 1], was admitted to the practice of law on October 21, 1974. He has maintained his principal office in [       ], Pa. where he has practiced law with [respondent 2] under the partnership name of [respondent 1 & respondent 2]. [respondent 1] has conducted a statewide practice which has specialized in serving individuals seeking a low-cost consensual divorce under the Pennsylvania Divorce Code.

Respondent, [respondent 2], was admitted to the practice of law on October 30, 1972. He also has maintained his principal office in [       ], Pa., where he has practiced law with [respondent 1], under the partnership name of [respondent 1 and respondent 2]. [respondent 2] has conducted a statewide practice which has specialized in serving individuals seeking a low-cost bankruptcy proceeding.

The record reveals numerous ads placed by respondents offering the same legal services, either no-fault divorces or bankruptcy cases, but at different overall prices and different combinations of prices for legal services and court costs. Respondents advertised in all parts of Pennsylvania, in virtually all daily newspapers and in "hundreds of weekly pubications". Some of respondents' ads were anonymous and gave only phone numbers for the reader to call and contained no attorney's name. Other ads contained the name of one or both of re-

spondents and sometimes the name of one or another of respondents' associates. In most instances, only one name was used per ad. Some ads were almost identical in the same publication except for differentials in prices. Other ads contained addresses and phone numbers for respondents in the locale of the publications. In many instances respondents did not attend such offices on any regular basis, if at all, and the phone numbers, though local phone numbers, were actually connected to respondents' [    ] office through the mechanism of call-forwarding. The record reveals no contest over the content of the various ads and their placement by respondents. Respondents' primary defense was that the purpose of such multiple advertisings was to enable them to collect market data on the public's response to different prices, different price combinations, and the ethnicticity of attorneys' names, thereby enabling respondents to determine how best to advertise, meet competition, and thus gain more business.

## III.  DISCUSSION

The hearing committee concluded that respondents' advertising practices resulted in several specific instances of both false and misleading advertising. Although the hearing committee did not find that there was actual fraud involved on the part of respondents or any specific intent to harm the public, respondents' advertising practices did result in advertisements that could reasonably be expected to and in many instances actually did, initially lead interested persons to believe the following: (1) That respondents' ads represented several lawyers competing for the no-fault divorce and simple bankruptcy business; and/or (2) that there were real

differences in the nature and quality of service one might receive by paying a higher price; and/or (3) that the lawyers who are advertising were local lawyers, with local offices, and personally accessible to prospective clients.

Respondents testified that they told callers about the other ads in the publication that also were placed by them, especially if the callers were responding to one of their ads that carried a price higher than the lower or lowest price of respondents' ads. This information was supplied to callers to keep them from calling again in response to other ads placed by respondents and thereby tying up their telephone lines. Respondents informed the persons who had become their clients that they, respondents, were located in [        ] and not in the locale or region of the advertisement and that they could not personally consult with clients without charging a price higher than the one advertised. Based upon their contention that the purpose was to collect market data and their practice of supplying callers with accurate information at the appropriate time, respondents contend that no violation, or at most a "technical" violation, is all that occurred. However, as the hearing committee observed,

"While Respondents' clients, after having been told the truth and with their cases in process or completed, might not have been concerned about their initial impressions or about the multiplicity of ads and prices of Respondents or their personal unavailability, the subsequent relevation of the truth to them does not neutralize the initial deception. Nor does it make acceptable for the Disciplinary Board to ignore or otherwise allow such practices to continue. Likewise, Respondents' defense of 'test-marketing', even if given credibility, is no defense for false or misleading advertising. Even

'test-marketing' must be done without a requirement of initial deception to collect data."

Based upon our review of the recommendations and the excellent report of the hearing committee in this matter we have concluded that substantial suspensions, and not private reprimands are the appropriate sanctions to be imposed. Respondents clearly intended their multiple ads to be deceptive and misleading. They intended readers to believe that their multiple ads represented different competing law firms and to leave the impression that local offices were maintained. No lesser result would have served their stated purpose, "to secure market data." We endorse the analysis of the hearing committee:

"Respondents' approach to the practice of law is non-traditional. They have found that a large volume of business is required to make it profitable. They have to advertise extensively to obtain the volume; however, their pattern and design of advertising is clearly misleading to the public and creates untrue impressions concerning the nature of the competition for divorce business, price plans, and the physical location of the attorneys. Such designs and patterns are per se harmful because they mislead and are deceptive; consequently, they must be proscribed."

Furthermore, as the hearing committee noted, "Respondents seemed unappreciative of their advertising and went boldly forth without questioning it despite the timely intervention of Disciplinary Counsel." Under all the circumstances, suspensions are warranted.

## IV. FINDINGS OF FACT

The Disciplinary Board of the Supreme Court of Pennsylvania hereby adopts the following findings of fact of the hearing committee:

1. Petitioner, whose principal office is located at 300 North Second Street, Harrisburg, Pa., is invested pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of attorneys admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

2. Respondents, [respondent 1] and [respondent 2], are partners in the practice of law.

(a) Respondent, [respondent 1], Esq., was born in 1948, admitted to practice law in the Commonwealth of Pennsylvania on October 21, 1974, and his office is located at [        ].

(b) Respondent, [respondent 2], Esq., was born in 1945, admitted to practice law in the Commonwealth of Pennsylvania on October 30, 1972, and his office is located at [        ].

3. As admitted by respondents, they placed eight separate advertisements in the Legal Services section of the classified ads of the [        ] Press on Sunday, [        ], 1982. Except for one, they were anonymous.

4. Each separate advertisement offered the same services, i.e. "no-fault divorce" and/or "bankruptcy"; however, each ad was different, some in the total price for bankruptcy ($375, $370, and $365) or divorce ($148 total, $81.25 total, $78 total, and $75 total) and others having different telephone numbers for respondents, but otherwise anonymous, except for one showing Attorney [1's] name for a total price of $148 for a divorce. Five different [        ] telephone numbers and one "800" number were used in eight ads, all of which were placed by respondents.

5. There was no immediately observable connection between the telephone numbers in the anonymous ads, so as to make it reasonably apparent that they were placed by the same attorneys or that the service was the same for no-fault, consent divorces, which in fact it was, no matter what the price.

6. Four separate advertisements were placed by respondents [1] and [2] in the Legal Services section of the classified ads in the Wednesday, [       ], 1982 edition of the [       ] Daily News.

7. Each separate advertisement provided a different total price for "no-fault, consent divorce," ($135 total, $95 plus costs, $120 total, and $70 plus costs) and listed a single member or associate of the law partnership of respondents [2] and [1], i.e. [respondent 1], [respondent 2], [A], or [B], respectively, without revelation of the association of each attorney, and further provided one of two different local [       ] telephone numbers and/or an address at [       ].

8. It was respondents' purpose in so placing the ads to conceal from the public the fact that the same attorneys placed the ads and, at least initially, to mislead the public in this regard.

9. The pattern of advertising used by respondents was misleading on its face and could reasonably be expected to give the immediate and false impression that several different, unassociated attorneys were competing for no-fault divorce and bankruptcy business.

10. The pattern was misleading in that it could reasonably be expected to cause, and in fact did cause, members of the public to wrongly believe from the ads, that different levels or qualities of service for no-fault divorce or bankruptcy work were available by the attorneys who placed the ads.

11. The pattern was misleading also in that the ads stated or implied that the attorneys or attorney named therein would perform advertised services when, in fact, only respondent [1] performed divorce work, and only respondent [2] performed bankruptcy work.

12. It was respondents' purpose to have the public believe that those attorneys named in the ads would actually do the work, either for reasons related to respondents' alleged "test marketing" or as respects to the appeal of certain ethnic names to members of the public or to lead the public to believe that different attorneys were advertising, or to enable respondents to determine what total prices or combinations of fees and costs most appealed to the readers' psychological makeup, or to meet real competition by identical ads with slightly lower prices or even if, as petitioner claims, respondents' pattern of ads was designed to give a false impression of the competition even so, and in any of the foregoing events the pattern was in fact misleading and false in some cases (for example, [A] and [B] did no divorce work at all), and knowingly used by respondents to mislead the public.

13. Since they formed their partnership, respondents [1] and [2] have advertised no-fault divorce services across the state and have provided in their ads certain regional office addresses and telephone numbers for [    ], [    ], and [    ].

14. Respondents [1] and [2] have not frequented those office addresses or provided staff members (neither associate attorneys or others) at said office addresses for consultation with clients and/or processing of divorce matters as would reasonably be expected from respondents' advertisements.

15. Respondent [1] is and has been the only attorney in the law firm of [respondent 2] and [re-

spondent 1] who performs such advertised no-fault divorce services, and he does so exclusively in his [    ] office.

16. Prospective clients who call the regional or local (including [    ] and [    ] proper) telephone numbers provided in the advertisements placed by respondents in publications beyond the region of the [    ] office (as designated by respondents) are automatically connected by "remote call-forwarding" with respondents' [    ] office.

(a) Respondent [1] and his staff obtain certain preliminary information, including residence, and explain the nature of the legal services during the initial telephone inquiry of a prospective client.

(b) Generally, during this initial call, respondent [1] and his staff (pursuant to respondents' instructions) do not reveal respondents' location (in [    ]) to prospective clients who reside beyond the region designated by respondents to be covered by the [    ] office.

(c) If a prospective client desires to pursue the no-fault divorce advertised by respondents, he or she is then sent follow-up sequential, form correspondence on respondents' letterhead which are for the advertised (or nearest) regional office address (such as [    ] or [    ]) of respondents and which is enclosed in envelopes showing the same return address as the letterhead.

(d) After a retainer has been paid by such a prospective client, respondents discontinue the use of letterheads and envelopes showing the advertised (or nearest) regional office and thereafter use letterheads and envelopes of the [    ] office.

17. The use by respondents of letterhead and envelopes of regional offices which have no staffs can

reasonably be expected to reinforce the caller's belief that respondents are physically located at the address shown on the letterheads.

18. Normally, when the first letter bearing a non-[  ] office letterhead is mailed, the prospective client has not been informed that respondents are actually in [   ] and that there are no attorneys in the offices advertised.

## V. CONCLUSIONS OF LAW

The Disciplinary Board of the Supreme Court of Pennsylvania makes the following conclusions of law in this proceeding:

1. Respondents have engaged in specific instances of knowingly misleading advertising in violation of D.R. 2-101(A) (dealing with a lawyer engaging in, utilizing or allowing any form of advertising that is knowingly false, fraudulent or misleading).

2. Respondents have engaged in a general course of conduct evidencing knowingly misleading advertising.

## VI. RECOMMENDATION

1. The Disciplinary Board recommends to the Supreme Court of Pennsylvania that respondent, [1], be suspended from the practice of law for a period of six months with said period of suspension to run consecutively to the period of suspension previously imposed by this court in the proceedings at No. 56 D.B. 82.

2. The Disciplinary Board recommends to the Supreme Court of Pennsylvania that respondent,

[2], be suspended from the practice of law for a period of six months. The Disciplinary Board further recommends that the cost be paid by respondents.

Messrs. Helwig and McGinley did not participate in the adjudication.

## ORDER

NIX, C.J., And now, this February 28, 1985, upon consideration of the recommendation of the Disciplinary Board dated January 18, 1985, it is hereby ordered that [respondent 2] be and he is suspended from the Bar of the Commonwealth for a period of six months, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.D.R.E.

Mr. Justice McDermott and Mr. Justice Zappala did not participate in the consideration or decision of this matter.

## ORDER

NIX, C.J., And now, this February 28, 1985, upon consideration of the recommendation of the Disciplinary Board dated January 18, 1985, it is hereby ordered that [respondent 1] be and he is suspended from the Bar of the Commonwealth for a period of six months, to run consecutively to the suspension imposed by this court on September 7, 1984, at No. 56 D.R. 82, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice McDermott and Mr. Justice Zappala did not participate in the consideration or decision of this matter.